## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

The Investment Center,

     **Plaintiff,**

v.

Great American Insurance,

     **Defendant.**

04-CV-6204 (WJM)

**OPINION**

Craig S. Hilliard
Stark & Stark PC
Princeton Pike Corporate Center
993 Lenox Drive
P.O. Box 5315
Princeton, NJ 08543-5315

     *(Attorneys for Plaintiff)*

Stephen N. Dratch
Franzblau Dratch, PC
Plaza One
354 Eisenhower Parkway
P.O. Box 472
Livingston, NJ 07039-0472

     *(Attorneys for Defendant)*

**MARTINI, U.S.D.J.:**

     This matter comes before the Court on Defendant Great American Insurance's ("GA")

motion for summary judgment and Plaintiff The Investment Center's ("TIC") cross-motion for

summary judgment.  There was no oral argument.  Fed. R. Civ. P. 78.  For the reasons set forth

below, GA's motion is **GRANTED**, TIC's motion is **DENIED**, and TIC's complaint is

**DISMISSED**.

1

## I. Introduction

This is a declaratory action for coverage under a fidelity bond issued to TIC by GA. The sole issue for resolution of this case is whether TIC had knowledge of a former employee's fraudulent activity prior to GA issuing the bond.

## II. Statement of Facts

In January 1999, GA, an insurance provider, issued a fidelity bond to TIC, a broker-dealer firm, covering losses resulting from fraudulent acts of employees. The bond period ran from January 1, 1999 through January 1, 2000 and covered only losses discovered by TIC during this period. Further, the bond would immediately terminate as to any employee if and when TIC became aware of dishonest or fraudulent acts committed by the employee.

Between June 1997 and May 1998, TIC employed a broker named Jeffrey Barber in its Casper, Wyoming office. During that time, TIC employee Dorian Fox served as Barber's supervisor. In March 1998, Fox received a telephone call from a TIC client, Joe Fuller ("Fuller"), who indicated to Fox that he had loaned Barber money and was trying to locate him. Concerned that Barber was borrowing money from clients in contravention to company policy, Fox reported the incident to TIC's compliance department. When Fox attempted to follow up with Fuller, however, Fuller explained that he and Barber had resolved the issue and that he did not wish to participate in an investigation.

In April 1998, Fox received another phone call from from a TIC client, Jim Mason ("Mason"), who told Fox he had given money to Barber to open a TIC account, but had not been receiving any statements on his investments. Fox discovered that no account had ever been

opened.  Fox confronted Barber, who explained that he had opened a trading account for Mason

in a discount brokerage account outside of TIC.  Once again, when Fox attempted to follow up

with Mason, Mason indicated he had resolved the issue with Barber and did not want to proceed

with an investigation.

Following this April phone call, Fox contacted Neil White in TIC's compliance

department, stating he did not wish to continue supervising Barber.  With White's approval, Fox

wrote a letter to Barber terminating his supervisory relationship with him.  In May 1998, TIC

gave Fox authority to fire Barber on the basis of "low production" and "noncompliance issues."

(Hilliard Decl. Exh. 12.)  At this point, Barber was given the option to resign voluntarily, which

he did.

Following Barber's departure, in August 1998, Fox received an NASD letter regarding a

complaint the NASD had received from a TIC client named Christine Coleman ("Coleman")

about Barber.  Although the precise contents of the letter are not known, Fox forwarded the letter

onto White.  White responded to it by submitting to the NASD documentation regarding

Coleman's TIC account and further stating that TIC did not have "any other complaints directed

against Mr. Barber."  (Dratch Decl. Exh. N.)

Shortly thereafter, in October 1998, Barber was arrested in Wyoming on fourteen felony

counts including securities fraud, forgery, grand larceny, and check fraud.  Barber had apparently

been taking money from people, including Coleman, with the representation he would invest it

without actually doing so.  Barber plead guilty to four counts in October 1999.

Following the arrest, in December 1998, TIC applied for a fidelity bond with GA to cover

a one-year period beginning January 1, 1999.  In its application, TIC did not inform GA of any

potential losses with respect to Barber.  When TIC finally did inform GA of the potential loss in

September 1999, GA declined coverage based on its belief that TIC had knowledge of Barber's

fraudulent activity prior to inception of the bond.  In April 2001, various victims of Barber filed a

civil suit against Barber, Fox, and TIC.  TIC now asks this Court to declare that GA had an

obligation to indemnify TIC for costs of the defense.

## III.    Summary Judgment Standard

Summary judgment eliminates unfounded claims without resorting to a costly and lengthy

trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).  However, a court should grant

summary judgment only "if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(c).  The burden of showing that no genuine issue of material fact exists rests initially

on the moving party.  *Celotex*, 477 U.S. at 323.  A litigant may discharge this burden by exposing

"the absence of evidence to support the nonmoving party's case."  *Id.* at 325.  In evaluating a

summary judgment motion, a court must view all evidence in the light most favorable to the

nonmoving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587

(1986); *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976).

Once the moving party has made a properly supported motion for summary judgment, the

burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine

issue for trial."  Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48

(1986).  The substantive law determines which facts are material.  *Id.* at 248.  "Only disputes

over facts that might affect the outcome of the suit under the governing law will properly

preclude the entry of summary judgment." *Id.* No issue for trial exists unless the nonmoving

party can demonstrate sufficient evidence favoring it such that a reasonable jury could return a

verdict in that party's favor. *Id.* at 249.

## IV.    Analysis

The issue of TIC's knowledge is the only issue for resolution of this case.  If TIC had

knowledge of Barber's activities prior to January 1, 1999, the fidelity bond would not cover any

resulting losses, since it only covered losses discovered between January 1, 1999 and January 1,

2000.[1]  If, however, the Court finds that TIC did not have sufficient knowledge of Barber's

activities prior to that date, neither side disputes that the bond would cover the attendant losses

and GA would have a duty to indemnify.

The Court is guided by the Third Circuit's opinion in *Resolution Trust Corp. v. Fidelity*

*and Deposit Co. of Maryland*, 205 F.3d 615 (3d Cir. 2000).  That case involved a bond with a

"discovery provision" identical to the provision at issue here and specified that the bond would

apply only to losses discovered during the bond period.  Interpreting the meaning of the term

"discovery" in that provision, the Third Circuit ruled that the insured need only "possess

sufficient information to lead to a *reasonable assumption* of a covered loss" to have "discovered"

the loss for purposes of bond coverage.  *Id.* at 631 (emphasis added).  In so ruling, the court also

---

[1] Section 3, the "discovery provision," of the bond issued to TIC reads in pertinent part:
"This bond applies to loss discovered by the insured during the Bond Period.  Discovery occurs
when the insured first becomes aware of the facts which would cause a reasonable person to
assume that a loss of the type covered by this bond has or will be incurred, regardless of when the
act or acts causing or contributing to such loss occurred, even though the exact amount or details
of loss may not then be known."

noted that "the discovery threshold is low."  *Id.* at 631 (citing *California Union Ins. Co. v. American Diversified Savs. Bank*, 948 F.2d 556, 563 (9th Cir. 1991).  Applying this standard, and for the following reasons, the Court finds that TIC had in fact discovered the fraud prior to January 1, 1999.

The facts are clear that Fox suspected Barber had been engaging in dishonest activities as early as March or April 1998.  Fox had received two phone calls from TIC clients alleging they had given Barber money and were trying to track him down.  And while both refused to participate in an investigation of the complaints, Fox admitted in his deposition that he ceased to trust Barber and for that reason, in April 1998, refused to continue supervising him.   Even if, at this point, TIC had no proof of fraudulent activity on the part of Barber, it knew at the very least that he had violated company policy by investing money for a client outside of TIC accounts.[2] (Dratch Decl. Exh. N.)  That TIC gave Fox permission to fire Barber in May 1998 at least in part because of "noncompliance" issues confirms this knowledge.

Further, shortly after Barber resigned, TIC received an inquiry letter from the NASD regarding Barber's work at TIC.  TIC argues in its briefs that it did not know the exact nature of the complaint or complaints under investigation.  However, the Court finds that, at the very least the inquiry alerted TIC to the fact that one of its own clients had filed a securities fraud complaint against Barber.

Finally, even if TIC could argue that the two phone calls in 1998 and the NASD inquiry did not give TIC enough "knowledge" as to exactly what activities Barber had engaged in, surely

---

[2]  The Court notes that the GA bond specifies that the bond terminates upon TIC's learning of any "dishonest" activities on the part of an employee.  (Dratch Decl. Exh. Q.)

6

his arrest, which had appeared in local newspapers and television, did.  Fox admits he knew of

Barber's arrest and that he saw at least one newspaper clipping and television segment regarding

it.  White also admits he knew of the arrest.  Although both claim they did not know what Barber

had been charged with specifically, at least one newspaper article noted he stood accused of

securities fraud covering the time he was employed by TIC.[3]  (Dratch Decl. Exh. T).  These facts,

combined with the circumstances leading to Barber's resignation and the NASD inquiry

following it, would lead any reasonable person to believe that Barber had engaged in dishonest

and fraudulent activities during his employment with TIC.  All told, based on these facts, no

reasonable jury could find that TIC had not discovered Barber's fraud prior to January 1, 1999.

**V. Conclusion**

        In light of the foregoing, Defendant's motion for summary judgment is **GRANTED**,

Plaintiff's motion for summary judgment is **DENIED,** and the instant complaint is

**DISMISSED**.


                                                                s/ William J. Martini
                                                                **William J. Martini, U.S.D.J.**


---

        [3] And while neither Fox nor White could recall seeing this particular article, courts do not
generally reward companies for refusing to acknowledge facts plainly staring them in the face.